**IRWIN R. EVENS & SON, INC. and Cincinnati Time, Inc., Appellants (Plaintiffs Below),**

v.

**BOARD OF the INDIANAPOLIS AIRPORT AUTHORITY and Indianapolis Electric Company, Inc., Appellees (Defendants Below).**

No. 49A04-9009-CV-408.

Court of Appeals of Indiana, Fourth District.

Jan. 15, 1992.

--------

Michael C. Cook, Julie L. Michaelis, Wooden McLaughlin & Sterner, Indianapolis, for appellants.

David Konnersman, Lewis Bowman St. Clair & Wagner, Indianapolis, for appellee Indianapolis Elec. Co.

Rex N. Joseph, Jr., Indianapolis, for appellee Bd. of Indianapolis Airport Authority.

MILLER, Judge.

Cincinnati Time, Inc., a disgruntled, losing bidder on a parking lot control system at the Indianapolis International Airport, joined with its in-state distributor, Irwin R. Evens & Son, Inc., a non-bidder acting as a taxpayer, seeking a preliminary and a permanent injunction to prevent winning bidder Indianapolis Electric Company (Electric) from performing the contract. Time and Evens (collectively Time) claimed that the Board of the Indianapolis Airport Authority (Airport) abused its discretion by awarding the contract in violation of statutory public bidding procedures.

After conducting discovery, Time filed a Motion for Partial Summary Judgment requesting the trial court to declare the contract between Airport and Electric void on the ground that Electric's bid was not responsive to Airport's specifications. Instead, the trial court entered final summary judgment in favor of Electric and Airport—denying Time's request for an injunction.

After Time's appeal was perfected, Airport and Electric notified this court that the contract had been fully performed and moved to dismiss the appeal alleging the matter was moot. Time contends that the fact that the contract has been fully performed does not render the issue moot because the integrity of the public bidding process is a matter of public importance which deserves a hearing on the merits.

We affirm the trial court because—even if the matter is not moot as to taxpayer Evens—Time failed to demonstrate that Electric's bid was not responsive to the specifications in such a substantial or material way as to warrant rejection.

### FACTS

We have summarized the facts as found in the trial court's findings 1–15[1] (based on the stipulations of the parties) as follows:

On August 14, 1989, Airport advertised for bids for a parking lot revenue control system. Airport retained independent engineering firm Donohue & Associates, Inc., (Donohue) to provide an estimate of the project's cost and to evaluate the bids. Donohue estimated the cost at $141,000. Time, Electric and Federal APD submitted bids for the project which were opened and read on September 29, 1989. Time's bid was $135,495; Electric's bid was $285,000; and APD's bid was $329,245. The Airport rejected all bids and readvertised for bids on November 1, 1989. On November 15, 1989, Donohue reviewed the project specifications and revised its estimate to $191,000. On November 17, 1989, the bids were opened. Time's bid was $123,895; Electric's bid was $204,347; and Federal APD's bid was $231,549.

On December 11, 1989, Donohue recommended that the Board accept the bid of Electric even though Time was the apparent low bidder. Donohue sent a letter to Jan Goldstein, Director of Parking for the Airport, to explain its reasons for preferring the Electric bid and rejecting the Time bid, including the following reasons:

1. Time used a magnetic stripe reader which required a higher level of maintenance than the punch hole reader required by the bidding documents;

2. Time ticket stock was more costly and would result in added yearly costs for the system;

3. Time system required manual clock adjustment at the start of the month instead of the long-term automatically programmable clock required by the Airport;

4. Time system was new and there was no long-term proven record of performance for their software package.

5. The specifications required the system to be installed within ninety days of the award of the contract. Time

**1.** When a court grants or denies an injunction, findings are required. T.R. 52(A). On the other hand, this is a summary judgment—no findings are required, but findings and conclusions may be helpful if the court specifies those facts that appear without substantial controversy or establishes that there are no material facts in dispute. *See e.g., Johnson v. Patterson* (1991), Ind.App., 570 N.E.2d 93, 97 n. 3.

required 180 days to complete the installation.

Airport accepted Electric's bid, making a record of its reasons for rejecting Time's bid in a memorandum as required by IC 36–1–12–4(9). The contract was awarded to Electric on December 15, 1989.

On January 22, 1990, Time filed its complaint alleging that Airport abused its discretion and acted contrary to law in awarding the bid to Electric. Time argued that Electric's bid was non-responsive in that it did not meet the supplemental qualifications required for bidders and it failed to provide material information required by the specifications.

After discovery, Time filed a motion for partial summary judgment, the parties made written stipulations and a hearing was held on March 28, 1990. Afterward the court entered findings of fact, denied Time's motion for partial summary judgment, and entered summary judgment in favor of Airport and Electric. The pertinent findings of fact follow:

"16. The specifications for the Project called for a parking system utilizing a punch hole encoded ticket.

17. The bid of Time was for a magnetic tape system, not a punch hole encoded system.

18. The bid of Electric was for a punch hole encoded system.

19. The Project's bid specifications prohibit sub-contracting more than Fifty Per Cent (50%) of the work on the Project.

20. That the bid specification further provided that any bidder in doubt as to the meaning of the specifications could seek clarification. Paragraph 10 of the Instructions to Bidders provided:

'If a Bidder finds discrepancies in or omissions from the Contract Documents, or if he is in doubt as to their meaning, he shall at once notify the Owner [Airport] in writing. Such notification must be made at least seven (7) consecutive calendar days prior to the bid date. *Neither the Owner, Engineer or Designer will accept telephone calls regarding questions about the Contract Documents. All inquires must be in writing*. All interpretations of the Contract Documents will be issued by addenda to all bidders. All addenda issued shall be acknowledged on the forms and will become a part of the Contract. [Airport] will not be responsible for any other explanation of interpretation of the Contract Documents.' [Emphasis in original]

21. [Airport] Board minutes indicate that clarification was requested regarding the vehicle loop detectors and shuttle bus entries and exits, but none was sought regarding the limitation on subcontracting. [Airport] and Electric interpreted such specification in the same manner. The record does not disclose that Time sought any clarification, or was prejudiced as a result."

22. That from 1945 until 1987, Evens was the distributor for [Time] and its predecessors in interest. From 1987 until the time of the hearing, Evens purchased equipment from [Time] and acted as a service representative for [Time] on an individual contract basis. At the time of the hearing Evens and [Time] were in the process of negotiating a distributorship agreement.

Based upon the foregoing Findings of Fact, the Court now makes the following Conclusions of Law:

## CONCLUSIONS OF LAW

"1. The Court has jurisdiction over the parties, the subject matter of this action.

2. That the law is with the Defendants [Airport and Electric] and against the Plaintiffs [Time and Evens] herein.

3. That because the Plaintiff Cincinnati Time, Inc. did not bid a system utilizing a punch hole encoded system, it was not a responsive bidder under I.C. 36–1–12–1.

4. That to the extent that bid specifications prohibiting sub-contracting more than Fifty Per Cent (50%) of the work on the project were ambiguous as to whether they prohibited the contractor from purchasing materials for the project in excess of Fifty Per Cent (50%) of the bid amount, the mechanism provided by the bid specifications which allowed a bidder

to seek clarification regarding any uncertainty as to the meaning of the bid specifications cured· such ambiguity.

5. That the Board of the Indianapolis Airport Authority is vested with broad discretion in determining that a bidder is responsible and the Court will not substitute its judgment for that of the Board in the absence of clear abuse of such discretion.

6. That the information submitted by [Electric] with its bid was adequate to allow [Airport], in the exercise of its discretion, to find that [Electric] was a responsible Bidder.

7. That the bid of [Electric] is in substantial compliance with the bid requirements.

8. That there is no material question of fact and [Airport and Electric] are entitled to judgment as a matter of law. R. 131–136.

## I. *Is the issue moot?*

Electric and Airport contend the case should be dismissed as moot because an injunction cannot operate to enjoin the performance of a contract which has been fully performed. *Miller v. Kankakee & Pine Creek Drainage Ass'n.* (1953), 232 Ind. 412, 112 N.E.2d 852.[2] Time argues that our supreme court has held that in matters involving great public interest or affecting the public generally, an appeal should not be dismissed even if a moot question is presented.[3] *Matter of Lawrance* (1991), Ind., 579 N.E.2d 32, (issue was whether the parents could authorize the withdrawal of artificially provided nutrition and hydration from their daughter, (who died during the appeal) a patient who was in a persistent vegetative state and who had never been competent to express her desires); *Ind. Educ. Employment v. Mill Creek Classroom Teachers* (1983), Ind., 456 N.E.2d 709, (involved negotiation of teacher contracts which is a matter of great public interest and occurs year after year); *State v. Morgan Superior Court* (1967), 249 Ind. 220, 231 N.E.2d 516 (the use of National Guard in the event of riots during a city election).

An appeal is moot—and this court lacks jurisdiction—when no effective relief can be rendered to the parties before the court. *Lawrance, supra.* An issue is deemed moot when it is "no longer live," when the parties lack a legally cognizable interest in the outcome, or when we are unable to provide effective relief upon the issue. *Ridenour v. Furness* (1987), Ind., 514 N.E.2d 273. However, even when the requested relief is unavailable, this court will review issues under an exception to the general rule when the case involves questions of great public importance. *Lawrance, supra.*

Unlike the federal mootness doctrine, it is not necessary under Indiana law that the issue is one which is capable of repetition, but likely to evade review. *Id.* at 37, n. 2. However, generally cases which fall within the public interest exception are those cases which contain issues which are likely to recur. *Id.* For example, in *Mill Creek Teachers, supra,* the teachers association had entered into a two-year contract with the school board, but salary and insurance issues were to be reopened at the begin-

---

**2.** *Miller v. Kankakee & Pine Creek Drainage Ass'n.* (1953), 232 Ind. 412, 112 N.E.2d 852, involved the deepening and widening of a public drainage ditch, but it is not clear whether the objectors in that case brought the suit because of irregularities in a public bidding contract or whether they were property owners affected by and objecting to the widening of the ditch.

**3.** Time further asserts that Airport and Electric have waived their right to file any Motion to Dismiss because their Petitions for Extension of Time for filing Appellee's briefs, included a verified statement pursuant to Ind.Appellate Rule 14(B)(4) that all motions to dismiss had been filed. Time further asserts that dismissal is inappropriate because the Affidavit submitted by Electric and Airport to support their Motion to Dismiss does not establish that the contract was completed after the Petitions for Extension of Time had been filed. However, we also observe that Time does not establish that the contract had been fully performed before Airport and Electric filed their brief or preliminary petitions. The determination of mootness is not a matter which can be waived. It is the prerogative of this court to determine whether to address an issue when we are informed that the matter is no longer live or has become moot as between the parties. *See, Lawrance, supra.*

ning of the second year for bargaining. The contract required salary increments in the second year for increased experience or training, and if no agreement was reached by the parties before the second school year contract agreement was finalized, the previous agreement would continue under the status quo and the board could prepare its tentative budget based on the first year salary schedule. The association complained that the board failed to abide by the status quo requirements in that the board failed to give the teachers any increase in salary for experience or training in the budget for the second year. The association filed an unfair labor practice complaint. The Indiana Education Employment Relations Board found that the status quo had been maintained. When the Hancock Superior Court overruled the Employment Relations Board, the school board appealed. This court determined *sua sponte* that the issue had been rendered moot because, after the complaint had proceeded through the courts, the parties had agreed to a new contract which included payment for the incremental raises withheld during the negotiation period. Our supreme court granted transfer and acknowledged that the issue was moot as between these parties; however, it recognized that the issue recurs whenever negotiation of a new contract continues after the start of a new school year and, thus, was an issue in many school districts throughout the state. Therefore, the court held it was an issue of great public interest since violations of the statute governing collective bargaining between school corporations and their certified employees could have a detrimental effect upon the overall educational environment and interfere with the normal public school educational process.

■ This case is unlike *Mill Creek*, and other cases involving matters of great public interest such as *Lawrance* where the same issue is likely to be repeated between different parties but the issue is one which

needs to be resolved as a matter of public policy. In this case, it is not the public bidding statutes which need interpretation, rather it is the terms of the specifications for construction of a particular improvement at the Indianapolis Airport which is at issue. Time does not suggest that the specifications of this particular construction contract are identical to others so that the same issue is likely to recur between these parties or others bidding on future public projects.

We also observe that the public bidding procedure is designed to protect the public treasury, and not to benefit a disappointed bidder. *Rice v. Scott County School District* (1988), Ind.App., 526 N.E.2d 1193; *Inman's Inc. v. City of Greenfield* (1980), Ind.App., 412 N.E.2d 126. Our courts have consistently held that even though a taxpayer may sue to *enjoin* a public body from wasting public monies by accepting a higher bid, the competitive bidding statute does not provide a cause of action for a disappointed bidder seeking money damages. *Rice, supra*, at 1197, n. 3.[4] It is clear that because the contract has been fully performed, the relief requested by Time—1) an injunction preventing the performance of the contract and 2) awarding the contract to Time—is unavailable.

This court has held that, in the absence of any temporary injunction, a contractor who has been awarded a public contract has the right and duty to carry out the apparently valid contract. The contractor, having performed under the color of an apparently valid contract, is entitled to the reasonable value of the labor and materials furnished even when the governmental unit acts without complying with its statutory directives. *Board of Commissioners of County of Lake v. Dedelow, Inc.* (1974), 159 Ind.App. 563, 308 N.E.2d 420. However, if the contract was wrongfully awarded, the contractor might not be entitled to

---

**4.** A bidder who seeks judicial review of the bidding procedures brings a private, not a public, lawsuit. However, where the suit is brought in combination with taxpayers, and is so combined that it is incapable of separate private and public treatment, the trial court is correct in treating the entire action as a public lawsuit. *Pepinsky v. Monroe County Council* (1984), Ind., 461 N.E.2d 128, citing *Gariup v. Stern* (1970), 254 Ind. 563, 261 N.E.2d 578.

all of his profits. *Id.*[5] Therefore, with respect to the taxpayer suit, the matter is not moot.

## II. Did the trial court err in awarding summary judgment?

 When we review the trial court's grant of summary judgment, we stand in the shoes of the trial court. *Fort Wayne Community Schools v. Fort Wayne Education Association, Inc.* (1986), Ind.App., 490 N.E.2d 337. Summary judgment is only proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). Here, the summary judgment was a denial of Time's request for injunction. A mandatory or prohibitory injunction—as opposed to a passive injunction which merely maintains the status quo—is an extraordinary equitable remedy which should be granted with caution. *Day v. Ryan* (1990), Ind.App., 560 N.E.2d 77. The plaintiff has the burden of demonstrating injury which is certain and irreparable if the injunction is denied. *Mid-America Marketing v. Falender Development* (1980), Ind.App., 406 N.E.2d 372. In making its decision, the trial court must weigh the harm to defendant if the injunc-

---

**5.** In *Board of Commissioners of County of Lake v. Dedelow, Inc.* (1974), 159 Ind.App. 563, 308 N.E.2d 420, the Board awarded a construction contract for a government complex to Eibel & Son, one of five bidders. The bidding documents asked for alternative bids to provide for flexibility in the cost of work to be done. However, the Board did not make the various alternative bids clear to the contractors. The Board tried to make the bids competitive by interpolating price quotations. The award was made to Eibel on December 18, 1970. Dedelow, one of the losing bidders, filed a complaint for injunction. Eventually, a permanent injunction was entered on July 1, 1971. Between the awarding of the contract and the date of the injunction, Eibel and the Board considered themselves bound by a valid contract and proceeded with the performance until ordered to stop by the court's order. After the injunction was granted, the Board invited bids. Eibel responded, and Dedelow did not; however, the contract was awarded to another contractor.

Eibel appealed that part of the court's order for injunction which prohibited the Board from paying Eibel for work done prior to the issuance of the injunction. This court agreed, holding that "the remedy of injunction is limited to future acts." *Id.* at 423. "In the absence of any temporary injunction, then Eibel had both the right and the duty to proceed to perform under the apparently valid contract. As it performed, the Board and the public received the benefits of its performance." *Id.* This court remanded to the trial court to modify the permanent injunction insofar as it proscribed work performed by Eibel before the injunction was issued. The *Dedelow* court also stated:

"It is important to emphasize that it is not this court's holding that [the winning bidder] is entitled to the contract price for the work it completed. *A rule that by proceeding to perform a contested contract a contractor could recover the entire contract price would expose governmental units to double liability in some cases. Therefore, the equitable remedy available must be limited to only the reasonable value of labor and materials furnished as of*

the time they were furnished. No recovery may be had for profits under the contract, or overhead attributable to the work done under the contract."

*Id.* at 424 (emphasis added). Courts from other jurisdictions are divided on whether damages are appropriate in cases such as the one at bar. *See, e.g., Sutter Bros. Construction Co. v. Leavenworth* (1985), 238 Kan. 85, 708 P.2d 190. Timely suit for injunction against execution of the contract furthers the statutory purpose; however, permitting an action for damages would be contrary to purpose, working a double detriment to the public which was already injured financially by improperly awarded contract to a higher bidder.

*Telephone Associates, Inc. v. St. Louis County Board* (1984), Minn.App., 350 N.W.2d 398. Losing bidder filed suit to enjoin performance of contract, but trial court denied injunction. Bidder appealed, but contract was completed while appeal was pending. Appellate court found contract had been improperly awarded, parties proceeded with performance of contract at their own risk, and remanded to trial court to provide appropriate relief without stating what relief might be proper. The dissenting judge would have affirmed the trial court's decision to deny injunctive relief, but opined that the appellant might have a valid claim for damages under a theory of an implied promise to consider all bids in good faith.

*Gerzof v. Sweeney* (1968), 22 N.Y.2d 297, 292 N.Y.S.2d 640, 239 N.E.2d 521. Seller of generator, a losing bidder in first round, persuaded board of a village to rewrite specifications so that its bid could be only winner in second round of bids. On appeal, the contract was held to be illegal. Various remedies were devised by the trial and intermediate appellate levels, including removing the generator and rebidding. Eventually, the Court of Appeals held that a reasonable remedy would be for the bidder to pay the board the difference the price of the generator specified in the first round of bids and the purchase price of the generator installed.

tion is issued as compared to the harm to plaintiff if the injunction is denied (no adequate remedy at law), and the court must consider whether an injunction is in the public's interest. *Id.* A trial court's grant or denial of an injunction lies within the sound discretion of the trial court, and the decision will not be overturned unless it is arbitrary or amounted to an abuse of discretion. *Ridenour, supra.*

### A. Was summary judgment appropriate when Time asked only for a partial judgment?

■ Time contends the trial court erred by granting summary judgment in favor of Electric and Airport when it had only filed a motion for *partial* summary judgment. Time claims the only issue before the court was whether Electric was a responsive and responsible bidder and the court was not to determine whether Time's bid was responsive. Time argues that it did not have an opportunity to brief whether it was a responsive bidder.

We disagree. The trial court's authority to enter summary judgment is considerable. 3 W. HARVEY, *Indiana Practice* § 56.5 at 625 (1988). Under our rules of procedure, "when any party has moved for summary judgment, the court may grant summary judgment for any other party *upon the issues raised by the motion* although no motion for summary judgment is filed by such party." Ind.Trial Rule 56(B). While the motion was denominated as a motion for partial summary judgment, the relief for a permanent injunction requested

the court to enter summary judgment in favor of Time, declare the contract between Electric and Airport void, and award the contract to Time.[6]

Despite Time's claims to the contrary, the court's inquiry was not limited to whether Electric's bid was responsive, but whether an injunction was appropriate.[7] In determining whether the contract was void, the court first needed to decide whether Electric's bid was responsive and Electric was a responsible bidder. If the court determined as a matter of law that Electric's bid was responsive, it could *not* enjoin the contract unless it also determined that Electric was not the lowest responsive and responsible bidder and that Airport had arbitrarily rejected the lowest responsive and responsible bidder. Next, in order to determine whether Electric was the lowest bidder, the court was required to determine whether Time's bid (or any other bids) was responsive and whether time was a responsible bidder. Therefore, Time's own responsiveness was an issue inherent in its motion requesting a permanent injunction. Thus, the court did not err in considering Time's responsiveness and in considering the request for partial summary judgment as a motion for summary judgment.

### B. Review of agency decisions

■ Judicial review of decisions of a public agency is limited. *Bowen Engineering Corp. v. W.P.M., Inc.* (1990), Ind.App., 557 N.E.2d 1358. A reviewing court will not substitute its judgment for that of the

---

**6.** A hearing on a motion for preliminary injunction may be consolidated with the trial on the merits of the action for a permanent injunction. T.R. 65(A). In this case, the matter had been set for hearing "on March 12, 1990, for a trial on the merits on [Time's] request for a preliminary and permanent injunction and *for a hearing on any motion for summary judgment filed by [Time]*." (See Plaintiff's request for Hearing on Motion for Partial Summary Judgment, R. 58, emphasis added). The March 12, 1990, hearing date was rescheduled, and a hearing was held on March 28, 1990.

**7.** The motion reads as follows:
"Pursuant to Rule 56 of the Indiana Rules of Trial Procedure, plaintiffs Irwin R. Evens & Son, Inc., and Cincinnati Time, Inc. move the

Court to enter partial summary judgment in their favor and against defendants Board of the Indianapolis Airport Authority and Indianapolis Electric Company, Inc., declaring the contract between defendant void and permanently enjoining defendants from performing the contract. This Motion for Partial Summary Judgment is based upon the pleadings and the Stipulations of the Parties filed herewith. *Based upon the undisputed facts, plaintiffs are entitled to partial summary judgment as a matter of law on the issue of whether the contract between defendants is void and thus whether plaintiffs are entitled to a permanent injunction enjoining defendants from performing the contract.*" (R. 16, emphasis added.)

awarding body, but will reverse only when the challenged determination is clearly arbitrary, illegal, corrupt or fraudulent. *Id.* Where a board is vested with discretionary power to enter into public contracts pursuant to the competitive bidding, such as determining the best or most responsible bidder as well as the lowest bid, an honest exercise of such discretion will not be disturbed by the courts. *Budd v. Board of Commissioners of St. Joseph County* (1939), 216 Ind. 35, 22 N.E.2d 973; *Metropolitan School District of Martinsville v. Mason* (1983), Ind.App., 451 N.E.2d 349. An arbitrary and capricious administrative act is one which is willful and unreasonable, without consideration and in disregard of facts or circumstances in the case; the act is one without some basis which would lead a reasonable and honest person to the same conclusion. *MSD of Martinsville, supra.*

▪ Competitive bidding procedures require the Board to award the contract to the "lowest responsible and responsive bidder" or "reject all bids submitted." IC 36–1–12–4(b)(8). However, the statute also provides:

> "*If the board awards the contract to a bidder other than the lowest bidder,* the board must state in the minutes or memoranda, at the time the award is made, the factors used to justify the award, and the board shall keep a copy of the minutes or memoranda available for public inspection."

IC 36–1–12–4(b)(9), emphasis added. The meaning of a single section of a statute is to be considered in context with other sections of the same act, and if possible, every word must be given meaning and effect. *Shettle v. Meeks* (1984), Ind.App., 465 N.E.2d 1136. Clearly, subsection (9) gives the board authority to award the contract to other than the *lowest* bidder—as here— if it justifies its decision in a memorandum

available for the public to review so long as the winning bid is responsive and the bidder is responsible.

### C. Time's responsiveness

While Time was the apparent low bidder, the board and the trial court determined that its bid was not responsive because it differed from the functional and physical characteristics required by the board. Airport documented its reasons for rejecting the Time bid at the time that it awarded the contract, as required by statute. If Time's bid was not responsive, then Electric's bid became the lowest. Time argued at the hearing that the bidding documents permitted bidders to submit alternate plans for consideration; [8] however, on this appeal it asserts its responsiveness is irrelevant. Therefore, Time has waived any claim that the trial court's finding and conclusion that Time was an unresponsive bidder is in error.

### D. Was Electric's bid responsive?

▪ Time argues the Board acted illegally in awarding the contract to Electric because Electric's bid was not responsive. A bid is deemed "responsive" if it conforms in all *material respects* to the awarding authority's specifications. Specifications are defined by IC 36–1–12–2.4 to mean a "description of the physical characteristics, functional characteristics, extent, or nature of any public work required by the board." While minor variances will not render a bid invalid, "a material variance which affords one bidder a substantial advantage not available to other bidders destroys the competitive character of the bidding process and must be rejected by the awarding body as unresponsive." *Bowen, supra,* at 1364, citing *Appeal of Associated Sign & Post* (1985), Ind.App., 485 N.E.2d 917.

---

**8.** "Notes" to the Specifications include:
"It is recognized that, because of the highly sophisticated nature of automatic computer-controlled parking system revenue control equipment, there may be basic differences in design features, operating characteristics, and record keeping functions of the products of the various

qualified equipment manufacturers. Such differences shall not prejudice any manufacturer so long as the overall Revenue Control System operates in strict accordance with the Specifications and function descriptions set forth herein." (Supp. Vol. I, 51).

First, Time claims that cost of the equipment and software supplied to Electric by its subcontractor, PSA, Inc., exceeds fifty percent of the total amount of Electric's bid and, thus, violates a specification that the "maximum amount of work that may be subcontracted on this project will be fifty (50) percent of the total amount of the bid." (R.Supp. Vol. 1, 4.)

It is undisputed that Electric listed PSA, Inc. (the manufacturer of the revenue control equipment purchased by Electric) as a subcontractor in its bidding documents, and the cost of the equipment, software and services listed in Electric's bid which were to be supplied by PSA exceeded fifty percent of the total amount of Electric's bid. However, Electric argues that the specifications do not mandate that fifty percent of the supplies could not be purchased from another entity, but merely that fifty percent of the "work" could not be subcontracted. Electric also argues that despite the fact that it listed PSA as a subcontractor, PSA is not a subcontractor but a *supplier*. Electric points out that a subcontractor generally means one who performs labor at the jobsite.

The statutes regarding State Public Works define a supplier as an entity supplying materials, but *no onsite labor* to a contractor. IC 4–13.6–1–20. A subcontractor is any person entering into a contract with the contractor to furnish *labor or labor and materials* used in the construction of the public works contract. IC 4–13.6–1–18.

The trial court found ambiguity as to whether the specifications prohibited a contractor from purchasing more than fifty percent of the supplies from one supplier. In our review of the specifications, we observe that "work" is defined as "the furnishing of all labor, *materials*, tools, equipment, and incidentals necessary or convenient to the contractor's performance of all duties and obligations imposed by contract, plans and specifications." (R.Supp. Vol. 1, 14, reverse side, emphasis added.) However, we agree with the trial court that there is ambiguity in the provisions. Here,

the supplies purchased from PSA were to be delivered to the job site where ownership was transferred to Electric. Electric at that point could be considered the supplier of all the work/materials as well as the installer performing the work at the job site.

Furthermore, Airport had the authority to waive the requirement. Section 18 of the Instructions to Bidders provides (pertinent part):

"The Owner reserves the right *to reject any and all bids* and to waive to the extent permitted by law any of the terms, conditions and provisions contained in the contract documents, or any informality, irregularity or omission in any bid provided that such waiver shall be at the discretion of the Owner and be to the Advantage of the Owner and in its interest."

(R.Supp. Vol. I, 6.) Minor variances from specifications will not necessarily render the bid invalid, but a material variance giving one bidder a substantial advantage or benefit not enjoyed by other bidders requires rejection. *Appeal of Associated Sign & Post, supra.* Electric argues that it gained no advantage by purchasing most of the supplies from one supplier and suggests that such was demonstrated by the fact that its bid was in fact higher than Time's bid—a manufacturer of equipment and software. On the other hand, Time did not offer any evidence or demonstrate how a bidder could gain a substantial advantage—financial or otherwise—from purchasing all its supplies from one supplier.

The trial court found ambiguity in the bidding documents and Electric's bid was in substantial compliance with the specifications. We note that the trial court was presented with stipulated facts. There is no dispute as to the wording or provisions of the contract specifications. Time did not submit any affidavits suggesting that the ambiguity could be clarified by other than an examination of the four corners of the instrument.[9] The construction of a con-

9. Electric and Airport submitted affidavits attempting to explain the intent of certain provisions in the bidding documents.

tract is generally a question of law for which summary judgment is particularly appropriate. *Kordick v. Merchants National Bank & Trust Co.* (1986), Ind.App., 496 N.E.2d 119. Even though conflicting facts and inferences may exist regarding certain elements of a claim, summary judgment is proper where there is no real conflict regarding a fact dispositive of the litigation. *Watson v. Medical Emergency Services, Corp.* (1989), Ind.App., 532 N.E.2d 1191. Thus, we hold that the trial court's construction of the contract in Electric's favor with respect to this issue was not clearly erroneous.

Time raises another issue. It argues that Electric did not meet the specification requirement that bidders submit evidence to establish past successful performance and reliability of the system installed. It also claims the trial court allowed Airport to ignore the statutes and its own specifications to subvert the competitive bidding process by allowing Electric and PSA to combine separate bids which standing alone would not meet the requirements of the Specifications. These two arguments are essentially the same although restated in a slightly different manner.

■ Electric's position is that it was the bidder on the project, not PSA. It also argues its bid included items provided by PSA in order to meet the requirements of the bid documents, but that ultimately it—not PSA—was responsible and would be held liable for all aspects of the contract. It also argues that this issue goes to whether it was a responsible bidder, not whether its bid was responsive. A board has broad discretion in determining whether a bidder is responsible. *Appeal of Associated Sign & Post, supra.*

■ Time argues the winning bidder was personally required to comply with these provisions of the specifications:

"To be considered qualified to bid on this specific contract, all bidders must also provide the following:

1. Evidence, by notarized statement, of continuous manufacture of parking equipment of a same or similar nature to the equipment called for in this specification for a period of at least three years prior to the receipt of the bid proposal.

2. Evidence of multiple technical personnel and program development capability sufficient to prepare, test and implement all necessary software required to fully operate the parking revenue control system called for in this specification and to provide all required reports, audit trails and related information along with training and maintenance programs and related items included in this specification.

3. Evidence of installation and successful operation of parking equipment of a same or similar nature to the equipment called for in this specification for not less than five parking facilities with an aggregate space count of not less than 7,500 spaces.

4. Evidence of installation and successful operation of parking equipment of a same or similar nature to the equipment called for in this specification at not less than three major airports located in the United States. Information on such systems, including the type and extent of the system supplied, number of parking spaces and owner references shall be supplied with the bid proposal.

5. Evidence of ability to obtain, manufacture and test equipment components, prepare and test software and install the complete parking equipment package in conformance with the schedule set forth in this document.

6. Written guarantee of the continued availability of parts and additional units identical to or compatible with all units, subassemblies and components of the equipment called for in this specification for a period of not less than five years from the date of final acceptance of the equipment called for in this specification by the Indianapolis Airport Authority.

(Supp. Vol. 1, 7.)

Time argues that Electric did not submit 1) a notarized statement establishing con-

tinuous manufacture of parking equipment; 2) evidence of technical personnel and program development; 3) evidence of installation and successful operation of parking equipment; 4) evidence of ability to manufacture and test equipment components; and 5) a written guarantee.

Electric stipulated that it does not manufacture parking equipment, but argues it met the supplemental qualifications by submitting the notarized statement of its supplier, PSA. (Supp. Vol. 1, 151–159.) Electric argues that the only logical way a bidder, who is not a supplier or manufacturer of such parking equipment, can comply with these requirements is to obtain the information from the supplier or manufacturer of the equipment and submit the supplier's information as part of the bid. Electric asserts that construction projects often include complex equipment and systems which are not manufactured by the installing contractor and that evidence that such equipment meets the specifications is usually provided in the form of written materials furnished by the manufacturer or distributor.

We see the logic to this strong argument. Although Time is complaining that more than fifty percent of the amount of the bid was obtained from one supplier, essentially a contractor who obtains a smaller portion of his supplies from a supplier would have the same problem. An installer—who was not a manufacturer of equipment—would have to rely on the manufacturer/supplier for the necessary affidavits demonstrating continuous manufacture, capability of training and maintenance, successful installation of the equipment, and guarantees of parts.

The trial court treated this issue as relating to the responsibleness of the bidder, rather than the responsiveness of the bid, and concluded that the information submitted was adequate for the Airport to exercise its discretion. We cannot say that this is a factual dispute which is inappropriate for summary judgment, nor can we say that the court applied the law incorrectly in coming to this conclusion. Under Time's interpretation only a manufacturer of the

equipment could be considered the "Contractor" or Bidder. When all the provisions of the specifications are read together it is apparent that Airport anticipated that the contractor, manufacturer and/or supplier of the parking system could be different entities; however, the contractor/bidder would be ultimately responsible for installation, warranties, replacement parts, and all other aspects of the contract. For example, the Specifications provide:

1.3.1 The contractor of the Revenue Control system shall have sole responsibility for the manufacture and installation of all parking equipment and revenue control equipment. The Contractor of the primary revenue control equipment shall be designated as the Contractor. It shall be responsible ... for the selection of any component or sub-unit to be *manufactured by other sources. In the event the Contractor obtains any component, sub-unit or product from any other suppliers, he shall be fully responsible as though they were of his own manufacture.* (Supp. Vol. I, p. 52, emphasis supplied.)

1.7.2 *If the Contractor shall include in his bid the supply of various components of the parking system* such as electronic parts or chips, gates, warning lights, loops, detectors, ticket printers, ticket readers, manned cashier terminals, central processors, display units or other major components *not of his own manufacture, he shall list all such suppliers* and appropriate parts numbers and relevant information as to the performance and operation of such components in his bid document. (Supp. Vol. I, 53, emphasis added.)

6.1.1 The listing of the equipment items set forth in this part of the specification represent those items to be furnished and installed by the Contractor, *including items that may be furnished by other sources* such as particular parts, software, services and related items of the entire Parking Lot Revenue Control System for which the Contractor assumes total responsibility for supply, installation and operation in accordance

with all other parts of this specification. (Supp. Vol. I, 78.)

7.2.2 Phase Two—Single Lane Installation Test *When the Contractor has completed installation* of the first entrance lane equipment and the first exit lane equipment, *the equipment shall be tested by the Manufacturer* and the staff of the Authority. (Supp. Vol. I, 80.)

Further evidence of the intent of the supplemental requirements is found in the memorandum in which the Airport staff recommended awarding the project to Electric. The memorandum states in pertinent part:

"The Cincinnati Time System rejected for the following reasons:

"1. The Specifications require the system to be fully tested and operating at a major airport. *The purpose of this requirement is to avoid having a new system tested at the Airport.* The current system, ArrowMicro, was a "first" of its kind. The result was excessive cost and operational problems.

"Cincinnati Time's proposal did not include major airport facilities that currently use their system. In fact, there is no facility that is using the software offered in their proposal."

(Supp. Vol. I, 194, emphasis added.) In addition, Jan Goldstein, Director of Parking for the Airport Authority, who was personally involved in the Bid Documents, indicated the intent of the various provisions was *not* to require that a bidder be a manufacturer, but to require that the system installed had been successfully operated at other major facilities. Goldstein Affidavit, Vol. I, 47–48.

Therefore, if the contractor/bidder was not required to be a manufacturer of equipment, a bidder could only submit evidence of past successful performance of the *system* from information provided by the manufacturer. Likewise, a contractor could not provide a written guarantee of the availability of parts without in turn relying upon the guarantee of the manufacturer.

The trial court concluded that there was no question of material fact, Electric's bid was in substantial compliance with the bidding requirements, and Airport and Electric were entitled to judgment as a matter of law. In essence, the trial court found that an injunction was inappropriate. We cannot say that the trial court's conclusion is arbitrary, an abuse of discretion, or contrary to law. We therefore affirm the judgment of the trial court.

CONOVER and RUCKER, JJ., concur.